UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| John G. Bourgoin,<br>*Plaintiff,*<br><br>v.<br><br>Kimberly Weir,<br>*Defendant.* | Civil No. 3:10cv391 (JBA)<br><br><br><br>September 23, 2011 |

RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

On August 19, 2010, Plaintiff John G. Bourgoin filed a Second Amended Complaint, suing Defendant Kimberly Weir, Deputy Warden at the Willard–Cybulski Correctional Institution in Enfield, Connecticut, in her individual capacity for inflicting cruel and unusual punishment through deliberate indifference to serious medical needs in violation of the Eighth Amendment to the U.S. Constitution. Defendant now moves [Doc. # 26] for summary judgment in her favor, arguing that Plaintiff has failed to demonstrate her personal involvement and has failed to offer evidence that would support an Eighth–Amendment claim and that she is entitled to qualified immunity. For the reasons stated below, Defendant's motion for summary judgment will be granted on the ground that Plaintiff has failed to offer evidence of Defendant's deliberate indifference.

I.  Undisputed Facts

Mr. Bourgoin was an incarcerated inmate of the Department of Corrections ("DOC") between December 8, 2004 and May 31, 2007. (Steele Aff., Ex. 1 to Def.'s Loc. R. 56(a)1 Stmt. ¶ 5.) He was housed at the Willard–Cybulski Correctional Institution ("Willard") from May 5, 2006 through March 23, 2007 and at the Osborn Correctional Institution ("Osborn") from March 23, 2007 through May 3, 2007, when he was released to a re–entry

furlough through May 31, 2007. (*Id.* ¶¶ 6–7.) In 2007, Defendant Weir held the rank of Deputy Warden at Willard, acting as an assistant to the Correctional Warden and directing the operations and administration at Willard; she is not a medical professional. (Weir Aff., Ex. 2 to Def.'s 56(a)1 Stmt. ¶¶ 3–4.) Deputy Warden Weir does not hire medical staff or supervise their clinical practice; instead the Correctional Managed Health Care Program at the University of Connecticut Health Center provides those services under contract to the DOC. (*Id.* ¶ 5.)

### A. Mr. Bourgoin's Condition/Treatment

Mr. Bourgoin's DOC Medical Records ("Records") note a diagnosis of and treatment for constipation beginning on March 12, 2006. (Medical Records, Ex. 13 to Def.'s 56(a)1 Stmt. at 71.) On March 13, 2006, he was being treated with the stool softener colace. (*Id.* at 72.) On March 24, 2006, he had "worsening symptoms" with respect to his constipation and was treated with the laxative dulcolax. (*Id.* at 72.) On April 19, he complained that his "belly is bloated" and that he was in pain and experiencing alternating loose bowel movements and constipation; metoclopramide was added to his treatment regimen "as a prokinetic agent." (*Id.* at 72–73.) An April 14, 2006 x–ray showed a "nonobstructive bowel gas pattern." (*Id.* at 39.) A second x–ray on May 4, 2006 "reveal[ed] formed stool throughout the colon consistent with constipation." (*Id.* at 38.)

On May 31, 2006, after DOC transferred Mr. Bourgoin to Willard, his Records note that he complained "my digestive tract is upset," which had been "ongoing since September, but more since January." (*Id.* at 75.) Mr. Bourgoin's Records contain entries on June 13 and 19, 2006 that do not include reference to his constipation. (*Id.* at 76–77.) On June 22, he complained of a "full, bloated feeling" and his Records note a plan to continue his same

2

treatment; on June 23, he complained of a "bloated sensation." (*Id.* at 77.) Mr. Bourgoin weighed 210 pounds on June 22. (*Id.*) A June 22 writeup for outside consultation for Mr. Bourgoin's constipation notes that simethicone and metamucil have been effective in the past and states "needs orders please." (*Id.* at 78.)

Further entries on June 26, July 18 and 21, and August 3, 7, and 11, 2006 do not refer to Mr. Bourgoin's constipation. (*Id.* at 79–80.) On August 23, 2006, Mr. Bourgoin weighed 200 pounds and complained that his last bowel movement had been the previous Friday, August 18. (*Id.* at 80.) An August 25, 2006 entry in his Records does not discuss constipation, but on September 18, 2006, Mr. Bourgoin complained of "midline" pain that "feels like a string pulling tight." (*Id.* at 81.) He weighed 206 pounds on September 18 and was "tak[ing] medications [and] metamucil; his abdomen was distended but he "[d]enie[d] constipation" and his Records note that he would be referred to a doctor for further evaluation. (*Id.*) The doctor's note on September 18 reads "will evaluate [and] start [treatment]." (*Id.*) Entries on September 25 and October 3, 2006 do not mention Mr. Bourgoin's constipation. (*Id.* at 82.) On October 13 his Records note a "sensation of bloating," that Mr. Bourgoin "has sluggish bowel habit," that he has a distended abdomen but good bowel sounds, and that "treatment [is] in progress." (*Id.*) Mr. Bourgoin received another x–ray on October 17, 2006, the report for which reads: "There is marked fecal loading of the large bowel. There is no evidence of abnormal calcifications or organomegaly." (*Id.* at 40.) He stated on October 24 that his "appetite is great." (*Id.* at 83.)

On November 1, 2006 his Records read "'bloating', diff[iculty] relieving gas, very constipated despite meds he is taking. In addition to prescribed medication [Mr. Bourgoin] claims to be taking metamucil [and water]. . . . States 'swelling just won't go down.'" (*Id.*)

3

The November 1 entry notes that Mr. Bourgoin's x–ray on October 17, 2006 "shows significant fecal loading in [large] bowel," and that he would be referred "back to MDSC" on November 3. (*Id.*) His November 3 entry states that he has "abdominal bloating" and "fecal loading." (*Id.* at 84.) On November 17, 2006, Mr. Bourgoin's Records read: "Continues to have severe constipation—will [increase] lactulose also place him on simethicone for flatulence." (*Id.*) On November 28 his Records read: "[Mr. Bourgoin] states the lactulose is only [increasing] his gas, however still constipated." (*Id.* at 86.) On December 5, 2006: "He continues to have severe bloating [and] constipation—He had clinical trial [with] several GI agents [with] no success." (*Id.*)

A December 5 physician's order in Mr. Bourgoin's Records shows that a doctor ordered a barium enema on that date. (*Id.* at 12.) The request form for the barium enema lists diverticulitis as a differential diagnosis. (*Id.* at 52.) The barium enema was scheduled for February 7, 2007 at the University of Connecticut Health Center but was not performed because Mr. Bourgoin did not undergo the proper "prep." (*Id.* at 47, 88.) The Records note "no show" on December 13, 1006 and January 8, 2007 and contain entries on December 14 and 26, 2006 and January 10, 16, and 22, 2007 that do not mention his constipation. (*Id.* at 86–87.) On January 24, 2007, Mr. Bourgoin stated that he was not "taking in" anything but protein shakes and could not drink coffee or juice "for fear of gas buildup," and that he "would like to have simethicone renewed." (*Id.* at 87.) He weighed 199 pounds on February 20, 2007. (*Id.* at 88.)

An entry in the Records on March 8, 2007 states "chronic obstipation" and "try polyclose, [increase] dose lactulose." (*Id.* at 89.) Another barium enema was scheduled for March 9, 2007, but was again cancelled and re–booked for March 29, 2007 because Mr.

4

Bourgoin did not undergo the proper prep. (*Id.* at 47, 89.) On March 19, 2007, he weighed 182 pounds and was "noticeabl[y] upset about what he describes as an intestinal blockage." (*Id.* at 90.) Medical staff reviewed the prep for the barium enema with Mr. Bourgoin on March 22; the prep began on March 26. (*Id.* at 90–92.) The barium enema was not performed on March 29, however, and the report stated that Mr. Bourgoin "needs better prep." (*Id.* at 93.)

Mr. Bourgoin's Transfer Summary of March 23, 2007 lists as a current condition "chronic constipation" and includes as current medications lactulose, castor oil, dulcolax, simethicone, and a fleets enema performed twice daily. (*Id.* at 23.) He states in his affidavit: "When I was discharged from prison, I immediately sought medical treatment and obtained two diagnostic procedures which helped me learn how to treat my chronic condition of diverticulitis within six (6) months and avoid further pain." (Bourgoin Aff., Ex. G to Pl.'s Loc. R. 56(a)2 Stmt. ¶ 10.)

B. Deputy Warden Weir

On January 25, 2007, Mr. Bourgoin submitted an Inmate Request Form to Deputy Warden Weir:

> Many request, in every manner possible except disrespectful has been written asking for medical help. The medical file should tell the story of my plight. The law(s) pertaining to what an inmate's rights to medical care reads: An inmate shall be entitled to reasonable and consistent care equaling that of a non–inmate. I was wondering when said law(s) would be respected.

(1/25/07 Request, Ex. B to Pl.'s 56(a)2 Stmt.) Deputy Warden Weir responded on February 1, 2007: "Mr. Bourgoin, now that you have quoted everything can you write me back stating

your concern/problem and I will review to see how I may assist you." (*Id.*) In a letter to Deputy Warden Weir on February 12, 2007[1] Mr. Bourgoin wrote:

> I need medical care. I have truly made every effort, including writing your office months ago. A blockage worsens preventing consumption of food and the severity was realized in January, 2006. Since the first xray was taken four others have shown a serious problem, however the D.O.C. continues to treat my situation with indifference. I was brought to UConn Medical Center and again an xray revealed extreme fecal blockage. The hospital's complaint was based on a failure for a colon flush which did not do the job. Medical has continued to evade their responsibility by again allowing me to suffer with this situation. The question posing concern here is: Why does medical fail to provide care even when the hospital states a serious problem exist [sic] and a colon flush needs prompt attention. Today is the sixth (6) day since I returned from hospital, why or how come I still am not recognized as having a real issue?

(2/12/07 Letter, Ex. C to Pl.'s 56(a)2 Stmt. at 1.) Deputy Warden Weir responded: "Mr. Bourgoin you are being seen by Medical here and an outside [appointment] has been scheduled for you." (*Id.*)

Mr. Bourgoin wrote to Deputy Warden Weir again on March 5, 2007: "Does this make sense? Because the D.O.C. is a public institution: '. . . its employees are protected by qualified immunity from civil liability as long as their conduct does not violate 'clearly established' statutory or constitutional rights.' Sounds right to me. Concluding: '. . . that a reasonable person would understand.' Please advise, respectfully." (3/5/07 Request, Ex. C

---

[1] The letter bears the date February 12, 2006, however Mr. Bourgoin was not yet housed at Cybulski at that point. In addition, Mr. Bourgoin claims that he requested Weir's assistance between January and March, 2007, without mentioning a letter from February, 2006. The letter also refers to four x–rays, the last of which, according to Mr. Bourgoin's Records was not completed until late 2006. At oral argument, Mr. Bourgoin's counsel clarified that the February 12 letter contains a typographical error and was actually sent on February 12, 2007. It will be referred to by this corrected date rather than the erroneous February 12, 2006 date.

to Pl.'s 56(a)2 Stmt. at 2.) Deputy Warden Weir responded: "Mr. Bourgoin, what is your point? Do you have a medical concern that needs to be addressed. I checked with medical. Nurse White states that you have been seen several times at sick call, MHV, and Dr. You have an [appointment] scheduled for 3/9." (*Id.*)

On March 13, 2007, Mr. Bourgoin wrote to Deputy Warden Weir once more:

> Should you consider a simple objective review of my medical file you would do a great service to yourself and countless others. There [sic] contain in the chart are several letters from UConn Medical Center which define procedures and contrary to positions held here, a real medical problem. That having been said please give thought to just one of the screaming questions which jump out at the reader. Is fairness sought for either party? Why on two occasions has UConn Medical Center not been able to perform a Barium (intestinal/colon) test? You might consider a second obvious question: Why while waiting the lengthy time period for test was I not at least given a reasonable flush (colon) so the incredible pain and nutritional discord could be minimized? This situation continues today.

(3/13/07 Letter, Ex. C to Pl.'s 56(a)2 Stmt. at 3.) The letter contains a postscript: "With all due respect, Ms. White no longer can remain objective—she's involved." (*Id.*) To Mr. Bourgoin's question about the inability to perform the barium enema, Deputy Warden Weir wrote: "Don't know." (*Id.*) To the question about why Mr. Bourgoin did not receive a flush, she wrote: "Don't know. Will forward your concerns." (*Id.*)

During her deposition, Deputy Warden Weir acknowledged that Mr. Bourgoin asked her to help him get proper medical treatment for his on–going condition, did not recall the exact dates of Mr. Bourgoin's letters, but recalled that he "quoted a lot of laws" and that after she asked him to get to the point "he wrote me back stating he had some medical concerns and that he didn't think he was being—receiving proper medical treatment. I referred his concerns to the nurse supervisor in medical." (Weir Dep., Ex. H to Pl.'s 56(a)2 Stmt. at

7

6:14–7:10.) Weir also testified that she later followed up as follows: "I responded to his request, and I also had communication with the nursing supervisor [Enrica White] there and advised her that he had wrote me asking about medical concerns that he had, and if she could speak with him or review his charts to ensure he was receiving proper medical care." (*Id.* at 7:11–20.) Nursing supervisor White reported back to Deputy Warden Weir that Mr. Bourgoin's "medical concerns were addressed, that he had scheduled appointments outside the facility, and he had seen medical and mental health." (*Id.* at 7:23–8:5.)

A March 7, 2007 e-mail from Deputy Warden Weir to Enrica White reads:

> Can you please review the chart of the above inmate and see him if necessary. He is writing me with complaints of not receiving proper medical attention for a severe problem he has (extreme fecal blockage/colon flush??) Claims he has been to UCONN had x-rays which show his problem yet he is still not receiving proper medical care.

(Ex. F to Pl.'s 56(a)2 Stmt.) Ms. White responded: "The above inmate has been seen several times at sick call, MHU, and MD call. Approved for an Outside Appointment tomorrow, March 9, 2007. Inmate is very angry, but also has mental health issues. Have a good day." (*Id.*) Mr. Bourgoin's March 13, 2007 Letter contains a note in the upper right corner directed to Ms. White: "CHNS White Please Review and advise" (3/13/07 Letter), but the record is silent as to any response from Ms. White thereafter.

II.   Discussion

   A.   Personal Involvement

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (internal quotation marks and citations omitted). Liability cannot rest on *respondeat superior*, or, in the prison context, on "proof of linkage in the prison chain of

command." *Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) (internal quotation marks and citations omitted). Supervisor liability can be demonstrated in one or more of the following ways:

> (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring.

*Id.* at 145.

A deputy warden such as Defendant may be liable under the second prong, for "failure to remedy a wrong after being informed through a report or appeal," where he or she acts or responds in an inadequate fashion to a prisoner's letter of protest or request. *See Walker v. Pataro*, No. 99Civ.4607 (GDB) (AJP), 2002 WL 664040, *12 (S.D.N.Y. April 23, 2002) ("[W]here a supervisor receives an inmate grievance or other complaint and responds to it, the supervisor may be liable.") A supervisor's response to a prisoner's grievance or complaint that "attempt[s] to defend or explain alleged constitutional violations" is sufficient to establish the personal involvement of that supervisor. *Id.* at *13–14 (denying defendant superintendent's motion for summary judgment where he responded to the plaintiff prisoner's retaliation grievance by responding that the grievance "was unsubstantiated based upon information received during investigation"). Failure to adequately supervise subordinates in response to a prisoner's grievance also may give rise to constitutional liability. *Johnson v. Wright*, 234 F. Supp. 2d 352, 364 (S.D.N.Y. 2002) (prisoner's allegations that the Commissioner of the Department of Correctional Services' failure to supervise his

9

subordinates in response to grievance letter resulted in the plaintiff not getting medical treatment were sufficient to survive a motion to dismiss).

Deputy Warden Weir's involvement in Mr. Bourgoin's medical grievances satisfies the second type of supervisory liability under *Hernandez*. According to the letters between Mr. Bourgoin and Deputy Warden Weir, she did not merely receive correspondence from Mr. Bourgoin, but responded to him personally and communicated with the nursing supervisor regarding his concerns. Although Deputy Warden Weir was not directly involved in the provision of medical care to Mr. Bourgoin and did not directly oversee his treatment plan, Mr. Bourgoin claims that as deputy warden for the facility, she was constitutionally deficient in personally communicating his complaints to the medical staff that did directly oversee his treatment. These actions in response to Mr. Bourgoin's complaints sufficiently demonstrate Deputy Warden Weir's personal involvement. *See Johnson*, 234 F. Supp. 2d at 364; *Walker*, 2002 WL 664040 at *12.

      B.      Deliberate Indifference to Serious Medical Need

"Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (citations omitted). "Deliberate indifference has two necessary components, one objective and the other subjective." *Collazo v. Pagano*, --- F.3d ----, 2011 WL 3873791, *3 (2d Cir. 2011). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter*, 316 F.3d 178, 183–84 (2d Cir. 2003).

### 1. Medical Need

Whether a deprivation is objectively severe is itself a two–part inquiry: (1) the prisoner must be "actually deprived of adequate medical care"; and (2) the inadequacy in medical care must be sufficiently serious. *Salahuddin v. Goord*, 467 F.3d 263, 279–80 (2d Cir. 2006). "Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Id.* at 280. This objective component "requires that the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hill v. Curcione*, --- F.3d ----, 2011 WL 4090760, *5 (2d Cir. 2011) (internal quotation marks and citations omitted).

Where a prisoner's complaint focuses on the adequacy of services provided during the course of regular treatment for a chronic condition, the seriousness factor does not focus on the underlying condition itself, but on the serious medical need posed by the failure to provide a particular treatment or a delay in the provision of that treatment. *Salahuddin*, 467 F.3d at 280 ("In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower. For example, if the prisoner is receiving on–going treatment and the allegedly unconstitutional conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry 'focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.'") (quoting *Carpenter*, 316 F.3d at 185).

The evidence comprised of Mr. Bourgoin's letters and Records reflects severe abdominal pain, fecal blockage, and significant weight loss. Medical staff noted several times

11

that he suffered from "severe" constipation and bloating, on one occasion going at least five days between bowel movements. From March 12, 2006 on, his Records reflect regular treatment for constipation, bloating, and "swelling [that] just won't go down," often without satisfactory results or marked improvement in Mr. Bourgoin's symptoms. On June 22, 2006, Mr. Bourgoin weighed 210 pounds; his Records reflect a weight of 182 pounds on March 19, 2007 and when he was discharged on May 4, 2007 he weighed 170 pounds. He frequently complained of pain and at times ate little more than protein shakes due to his discomfort. The failure to alleviate the symptoms associated with Mr. Bourgoin's chronic condition over this one–year period of time resulted in a painful and debilitating condition that both Mr. Bourgoin and his doctors regularly found worthy of comment. *See Salahuddin*, 467 F.3d at 280. His condition affected his daily activities, in particular his food intake, and caused chronic and substantial pain. *See id.* The significant weight loss—more than forty pounds—may be objective evidence of a deterioration in the state of Mr. Bourgoin's health from March 2006 on. The record is such that reasonable jurors could find that Mr. Bourgoin suffered from an objectively serious medical condition.

### 2. *Deliberate Indifference*

With respect to the subjective deliberate indifference component, "the official must have acted with the requisite state of mind, the equivalent of criminal recklessness." *Collazo*, 2011 WL 3873791 at *3 (internal quotation marks and citations omitted). "This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Salahuddin*, 467 F.3d at 280. "It is well–established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different

treatment does not give rise to an Eighth Amendment violation." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998). Instead, to rise to the level of culpable recklessness, a prison official's actions, or lack thereof, must "evince[] a conscious disregard of a substantial risk of serious harm." *Hill*, 2011 WL 4090760 at *6 (quoting *Chance*, 143 F.3d at 703).

Where prison medical staff have provided a constant and evolving course of treatment—even if not entirely effective—the failure to immediately provide a prisoner's preferred course of treatment does not constitute deliberate indifference to serious medical need. *See Ross v. McGinnis*, 2004 WL 1125177, * 10 (W.D.N.Y. Mar. 29, 2004) ("Plaintiff's complaints of abdominal pain, vomiting, heartburn, constipation, body odor and extreme body heat did not constitute a serious medical need. Even if they did, defendants were not deliberately indifferent to these complaints. Plaintiff was examined frequently and found to be in no acute distress. He underwent blood tests and was given a variety of medications to relieve his complaints. When these medications failed to provide relief, plaintiff was referred to a gastroenterologist and underwent additional blood tests, x–rays, and a lower and upper endoscopy, a barium enema and upper Gl series."); *Brisbon v. Thompson*, 2010 WL 2933627, *2 (W.D. Va. July 26, 2010) ("Even if I assume that plaintiff has a serious medical condition warranting Eighth Amendment protection, plaintiff fails to establish Dr. Thompson's deliberate indifference. Plaintiff admits, and his medical record confirms, that he has been receiving constant treatment from the defendant, including at least one prescription, for chronic constipation. Thus, plaintiff does not establish an Eight Amendment violation because he merely alleges a disagreement with the doctor's medical decisions about his treatment.")

Mr. Bourgoin claims that Deputy Warden Weir was deliberately indifferent to his serious medical need by failing to cause "the Department of Correction to provide him with appropriate and necessary medical care and treatment." (2d Am. Compl. ¶¶ 8–9.) Mr. Bourgoin argues that Deputy Warden Weir's deliberate indifference is evinced by her response to his March 5, 2007 request for help "asking him what the heck he was talking about," and the fact that she only sent Ms. White a single e–mail in response to Mr. Bourgoin multiple requests despite the fact that Mr. Bourgoin had been returned to the prison facility several times without the barium enema being performed because of insufficient "prep." (Opp'n at 9–10.)

In fact, Deputy Warden Weir responded to each of Mr. Bourgoin's communications, although in a caustic or snarky tone on occasions. In response to Mr. Bourgoin's January 25, 2007 request, Deputy Warden Weir asked him to clarify his problem so that she could review and assist him. (1/25/07 Request.) When Mr. Bourgoin wrote back on February 12 detailing his concerns, Deputy Warden Weir made inquiries and verified that he was being seen by the medical staff at Cybulski and told Mr. Bourgoin that he had an outside appointment scheduled. (2/12/06 Letter.) In response to Mr. Bourgoin's March 5, 2007 communication describing the law of qualified immunity, Deputy Warden Weir responded in part by telling him that she had "checked with medical" and that he had an outside appointment scheduled. (3/5/07 Request.) Deputy Warden Weir e–mailed Nursing Supervisor Enrica White on March 7 directing her to review Mr. Bourgoin's chart and received Ms. White's response confirming that he had been seen several times and had an outside appointment scheduled for March 9. (Ex. F. to Pl.'s 56(a)2 Stmt.)

This chain of communications makes clear that Deputy Warden Weir knew he was seeking her help in obtaining adequate care for his chronic and painful condition and that Deputy Warden Weir responded by obtaining information to "ensure that he was receiving proper medical care." (Weir Dep. at 7:11–20.) Prior to and during the period of these communications, Mr. Bourgoin received attention from the medical staff at Cybulski for his chronic constipation, including several x–rays and a diverse and evolving array of medications including dulcolax, metoclopramide, simethicone, metamucil, lactulose, and castor oil. In his March 13, 2007 letter to Deputy Warden Weir, Mr. Bourgoin challenged nursing supervisor White's attitude toward him and complained that UConn Medical Center had twice been unable to perform the prescribed barium enema, and that he had not received a colon flush while waiting for the barium enema in order to relieve his "incredible pain and nutritional discord." (3/13/07 Letter.) On March 23, 2007, Mr. Bourgoin was transferred to Osborn, which according to Defendant's counsel at oral argument, was a facility better suited to serve Mr. Bourgoin's medical needs.

After responding to Mr. Bourgoin's March 13 letter and forwarding it to Ms. White's attention, Deputy Warden Weir did not follow up with Ms. White during the ten–day period between the letter and his transfer to Osborn. This is the period that Mr. Bourgoin's counsel focused the Court's attention to as the time when nothing was being done to properly treat him because Deputy Warden Weir made no further response or inquiry, arguing that this evidences Deputy Warden Weir's culpable state of mind. The Court disagrees and no reasonable juror could find that this ten–day period of inaction after her prior responsiveness to this chronic condition that presented no immediate critical health threat constitutes "a conscious disregard of a substantial risk of serious harm," where Mr. Bourgoin

15

was transferred to another facility where was seen on March 24, 2007 for medical treatment including preparation for the barium enema. *See Hill*, 2011 WL 4090760 at *6. Nothing in the record suggests that Deputy Warden Weir acted to interfere with or prevent Mr. Bourgoin from receiving a diagnostic barium enema or colon flush or that she failed to make appropriate supervisory inquiries while aware that a serious harm would result from any further delay in treatment. *See Salahuddin*, 467 F.3d at 280. Even if Deputy Warden Weir's responses to Mr. Bourgoin's letters hardly sounded sympathetic, this is not a case where an inmate's serious medical need was ignored or unreasonably delayed, prolonging his severe pain or worsening his medical condition. *See Chance*, 143 F.3d at 703; *Ross*, 2004 WL 1125177 at * 10. Because the record contains insufficient evidence that Deputy Warden Weir acted with the requisite state of mind equivalent to criminal recklessness, she is entitled to summary judgment in her favor.

III.  Conclusion

For the reasons stated above, Defendant's motion [Doc. # 26] for summary judgment is GRANTED. The Clerk is directed to close this case.

IT IS SO ORDERED.

/s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 23rd day of September, 2011.